IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

**HENRY ADAMS, INC.**                                                                                          **PLAINTIFF**

V.                                       **CASE NO. 3:22-CV-3039**

**U.S. BANK NATIONAL ASSOCIATION;**
**GREAT AMERICAN TITLE COMPANY, LLC;**
**and SUSAN BECK**                                                                                         **DEFENDANTS**

## MEMORANDUM OPINION AND ORDER

Before the Court is a Motion to Dismiss filed by Defendant U.S. Bank National Association (Doc. 7) and a Motion to Dismiss filed by Great American Title Company, LLC ("GAT") (Doc. 12). Separate Defendant Susan Beck, a former employee of U.S. Bank, has not appeared in this case. Plaintiff Henry Adams, Inc. ("HAI") filed responses in opposition to both Motions, *see* Docs. 14–15 & 20–21, and U.S. Bank and GAT filed replies, *see* Docs. 18 & 25. The Court entertained oral argument from counsel during a motion hearing on September 27, 2022. For the reasons explained below, U.S. Bank's Motion to Dismiss is **GRANTED IN PART AND DENIED IN PART** and GAT's Motion to Dismiss is **GRANTED**.

### I. BACKGROUND

According to the Complaint (Doc. 3), non-party Brandi Dodgen acquired land in Green Forest, Arkansas, and made plans to build a home there. She approached builder Henry Adams, who is the owner of HAI, and they eventually entered into a construction contract. Their plans were not well defined on paper. An early handwritten contract noted a proposed cost-per-square-foot to build a three-bedroom, three-bathroom house, and included separate costs for installing a well, water lines, and a septic system. *Id.* at p. 42.

1

The total price for the build was $199,500. HAI and Ms. Dodgen agreed she would seek out financing to afford the cost of the build, so Ms. Dodgen asked U.S. Bank for a construction loan.

On February 19, 2019, U.S. Bank began reviewing Ms. Dodgen's request for a loan and asked HAI to submit certain documents, including a "Builder Approval Checklist," business references, a credit check authorization, and a detailed description of the construction materials. About a week later, on February 25, Mr. Adams and Ms. Dodgen signed a typewritten agreement that restated the total price of the build, $199,500, and noted: "All change orders that cannot be accommodated within the budget breakdown and transferring of funds from one line item to oter [sic] are the responsibility of the homeowner." *Id.* at p. 43.

On April 4, 2019, Mr. Adams prepared a handwritten note setting forth the amounts he expected to receive on four "draws" on the construction loan. *Id.* at p. 44. He also included a few details on the work he expected to have completed at the time of each draw. Ms. Dodgen's signature does not appear on this document.

On April 23, 2019, U.S. Bank authorized Ms. Dodgen to receive a residential construction loan in the requested amount of $199,500. On May 16, U.S. Bank's agents, Susan Beck, Rachel Lippe, and David Kean, had a conference call with Mr. Adams and a representative for GAT, a company that U.S. Bank had appointed as its escrow agent tasked with distributing the loan funds. *See id.* at pp. 48–49. During the conference call, Mr. Adams made everyone aware that he did not have a computer or an email account. Accordingly, it was agreed that Mr. Adams would bring his building invoices to GAT, and a GAT employee would help him manually fill out his draw requests. GAT would then

forward the draw requests to Ms. Beck at U.S. Bank, and Ms. Beck would help Mr. Adams fill out any other paperwork the bank required, including "builder's spreadsheets," which contained descriptions of work completed on the build site and materials used in the build. *See, e.g., id.* at p. 50.

On May 20, 2019, HAI (through Mr. Adams) and Ms. Dodgen entered into what the parties understand was their "final" contract. *See id.* at p. 45.  The contract is short on details.  It includes the general specifications for the home, the contract price, and the expected amount of each of the four draws on the loan.  Nothing was required to take place before the first draw; the second draw was to occur "when trusses are set"; the third draw was to occur "when sheet rock is hung"; and the fourth and final draw was to occur "upon completion." *Id.*  HAI asserts that Ms. Dodgen and HAI also entered into a number of side agreements about who would pay for appliances, fixtures, and excavation or "dirt work" on the lot before construction began.  HAI contends Ms. Dodgen understood and agreed that she would be footing the bill for these particular costs on her own—out of pocket—and that her costs were not included in the construction loan and would not be reimbursed to her from the loan's proceeds.

On June 25, 2019, the date of HAI's first scheduled draw, U.S. Bank approved an amount less than what HAI requested.  On August 5, the date of the second draw, U.S. Bank again approved an amount lower than HAI's demand.  It appears that around that time, the working relationship between HAI and Ms. Dodgen started to break down, and Ms. Dodgen began refusing to approve draw payments requested by HAI.  She accused HAI of shoddy workmanship and of requesting reimbursement for items that either Ms. Dodgen or her mother purchased out of pocket.

3

On September 23, 2019, the date of HAI's third draw request, Ms. Dodgen sent a letter to U.S. Bank and GAT stating in relevant part:

> I also don't want Henry Adams to get one more dollar unless he has a present, legal, and legible invoice.  He just sent me a copy of his final draw and it's offensive.  Charged for several items I paid for and several items not done.  He also sent me a letter[;] he is just "filling lines" to get money.  Fraudulent business practice!

*Id.* at p. 71.

HAI now blames U.S. Bank, Ms. Beck, and GAT for failing to distribute to him the full amounts of the draws he anticipated from the proceeds of the construction loan.  Some of the loan proceeds were paid directly to Ms. Dodgen after she presented proof to U.S. Bank that she had incurred construction-related bills from Home Depot and a loan from Anstaff Bank for excavation/dirt work.  HAI complains that U.S. Bank and GAT should not have released those funds to Ms. Dodgen, as that decision resulted in him not receiving a total of $63,526.38 in construction loan proceeds.

On November 21, 2019, HAI filed a materialman's lien (Doc. 7-1) against Ms. Dodgen's property in state court.  HAI brought suit to enforce and foreclose its lien, but according to the state court docket of the Circuit Court of Carroll County, in case number 08ECV2019-178, HAI moved to nonsuit its lien claim on March 13, 2020, and the state court dismissed it on April 22, 2020.  In the meantime, on April 3, 2020, Ms. Dodgen filed a lawsuit in Carroll County Circuit Court against HAI (Doc. 7-2), alleging negligence, breach of contract, deceptive trade practices, and breach of the implied warranty of sound workmanship. HAI countersued Ms. Dodgen (Doc. 7-3) on April 27, 2020, for fraudulent misrepresentation, promissory estoppel, and breach of contract.  About a year later, on March 11, 2021, HAI filed a third-party complaint (Doc. 7-4) against U.S. Bank, Ms. Beck,

4

and GAT, alleging the same quasi-contract and tort claims that are at issue in the case at bar.  Finally, on September 15, 2021, HAI nonsuited its third-party complaint and then refiled it on June 13, 2022, as a standalone case.  It was this standalone case that U.S. Bank removed to this Court on July 22, 2022, citing the diverse citizenship of the parties and the minimum amount in controversy.

HAI sues U.S. Bank and Ms. Beck for promissory estoppel, negligence, breach of fiduciary duty, and tortious interference with his contract with Ms. Dodgen.  U.S. Bank maintains all claims against it should be dismissed under Rule 12(b)(6), or in the alternative, stayed until the state court case between HAI and Ms. Dodgen is fully resolved.

HAI sues GAT for promissory estoppel, negligence, and breach of fiduciary duty—but not tortious interference.  GAT also moves to dismiss all claims against it under Rule 12(b)(6).

## II.  LEGAL STANDARD

To avoid dismissal under Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007)). A pleading containing mere "labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. *See also Iqbal*, 556 U.S. at 678 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice" and are "not entitled to the assumption of truth."). Rather, plaintiffs are required to make factual allegations which are "enough to raise a right to relief above the speculative level." *Twombly*, 550

U.S. at 555. "The complaint must allege facts, which, when taken as true, raise more than a speculative right to relief." *Benton v. Merrill Lynch & Co., Inc.*, 524 F.3d 866, 870 (8th Cir. 2008).

### III. DISCUSSION

### A. Promissory Estoppel

HAI did not enter into contracts with any of the Defendants. However, HAI contends Defendants should be liable in quasi-contract for making certain promises to HAI, which HAI relied on to its detriment. Specifically, the Complaint alleges that Defendants promised Mr. Adams that HAI would be paid "the guaranteed contract price of $199,500 per the Contract Documents with Dodgen for completed work, that Adams would receive the complete down payment before work began, and that U.S. Bank's disbursement procedures would be followed." *Id.* at pp. 21, 32, 33. However, the Court finds these factual claims clearly implausible: HAI admits that the construction contract at issue here was between U.S. Bank and Ms. Dodgen, and HAI does not allege any Defendant promised to pay HAI or Mr. Adams anything.

"[A] party asserting estoppel must prove that in good faith he relied on some act or failure to act by the other party, and, in reliance on that act, suffered some detriment." *K.C. Properties of N.W. Ark., Inc. v. Lowel Inv. Partners, LLC*, 373 Ark. 14, 30 (2008). HAI claims it relied on a promise all Defendants allegedly made that HAI would be paid every dollar demanded, without any meaningful inquiry into the nature of HAI's expenditures or performance and without input from Ms. Dodgen—the borrower on the construction loan. A close review of the Complaint makes clear that Defendants made no such promise. Instead, the Complaint claims that Defendants *failed to* "*inform* Adams

that [HAI] would *not* be paid the guaranteed payment of $199,500 dollars or inform Adams that it would treat the construction contract as a cost-plus or as time and material." *Id.* at p. 5 (emphasis added).  In other words, HAI would have the Court believe that a "failure to inform" is the same as a "promise to pay."

To establish a claim for promissory estoppel, HAI must show it relied in good faith on a promise.  Here, HAI made several assumptions about how it would be paid for construction services.  When it became clear to HAI that it would not be paid in the manner it had assumed, HAI first blamed Ms. Dodgen, suing her for breach of contract, and then blamed Defendants, suing them in quasi-contract.  Because the Complaint fails to state facts supporting a cognizable promissory estoppel claim against any Defendant, the claim will be dismissed without prejudice.

### B. Negligence

HAI also contends that when Ms. Beck and/or certain GAT employees communicated directly with Mr. Adams about construction expenses, assisted him in filling out the builder's spreadsheet, and discussed with him the amount and timing of draws, they voluntarily assumed a duty of care.  HAI maintains that "Susan Beck and U.S. Bank breached their duties of care to Adams by violating their own internal policies, failing to obtain Adams' consent [as to the accuracy of every item on the builder's spreadsheet] and failing to explain the issues with the spreadsheet to Dodgen causing Dodgen to incorrectly dispute charges and withheld [sic] legitimate payments that were due to Adams."  (Doc. 3, p. 27).   At bottom, HAI alleges that U.S. Bank is liable—both directly and vicariously—for the improper handling and disbursement of *Dodgen's* loan proceeds.  As for GAT, HAI asserts that it breached a duty of care by reducing or "alter[ing]" HAI's

draw requests—because HAI believes it was entitled to paid in full on all draw requests. *Id.* at p. 36.

In response to the motions to dismiss, HAI points to specific paragraphs in its Complaint and argues that those specific allegations plausibly support its negligence cause of action. But HAI's argument misses the point. A legal duty of care must be established before a defendant will be liable for negligence. *See Mans v. Peoples Bank of Imboden*, 340 Ark. 518, 524 (2000). "The question of the duty owed to the plaintiff alleging negligence is always one of law [, not fact]. If the court finds that no duty of care is owed, the negligence count is decided as a matter of law." *Farm Credit Midsouth, PCA v. Bollinger*, 2018 Ark. App. 224, 12 (2018).

Under Arkansas law, a bank may owe *its own customer* a duty to use ordinary care, but a bank owes no duty of care to *non-customers*. *See Arloe Designs, LLC v. Ark. Capital Corp.*, 2017 Ark. 21, 6 (2014) ("In order for a duty of care to exist between a bank and a potential borrower, the relationship between the bank and the borrower must be either fiduciary or special in nature, beyond a routine debtor-creditor relationship."). "In general, banks owe no duty of care to non-customers." *Quintero Cmty. Ass'n Inc. v. F.D.I.C.*, 792 F.3d 1002, 1011 (8th Cir. 2015). On the facts alleged here, U.S. Bank does not owe a non-customer like HAI any duty of care under Arkansas law.[1] *See Old Republic*

---

[1] HAI cites *Speights v. Arkansas Savings & Loan Association*, 239 Ark. 587 (1965), for the proposition that "negligence claims against banks have been upheld even in cases involving non-customers." *See* Doc. 21, p. 17. HAI is mistaken. *Speights* says no such thing. In that case, Mr. and Mrs. Speights were the defendant bank's *customers*. They had engaged a contractor to build an addition to their business property. To finance the construction, the Speightses obtained a loan from their bank. The loan was secured by a note and mortgage on the Speightses' property. The loan agreement stipulated that builder draws could only be advanced upon completion of certain specified stages of construction. The bank's agent, however, had advanced all the loan proceeds when only

8

*Nat. Title Ins. Co. v. Landmark Closing Co.*, 2010 WL 2228436, at *2 (E.D. Ark. June 1, 2010) (citing *Shane Smith Enters., Inc. v. Bank of Am., N.A.*, 2007 WL 1880201, at *2–3 (E.D. Ark. June 29, 2007) (collecting cases)). In the absence of a legal duty, HAI's allegations—even if accepted as true—do not state a cause of action.

HAI's remaining argument is that Defendants owed it a duty of care pursuant to Section 324A of the Restatement of Torts, which is commonly known as the "good Samaritan" doctrine. *See Wilson v. Rebsamen*, 330 Ark. 687, 695 n.2 (1997). Section 324A recognizes that if someone "gratuitously or for consideration" agrees to render services to another for his "protection," then the person who undertook the duty of care "is subject to liability to the third person for the physical harm resulting from his failure to exercise reasonable care to protect his undertaking." *Id.*

The Court finds that Section 324A of the Restatement of Torts is inapposite to the facts in this case. There is no allegation in the Complaint that HAI or Mr. Adams were under any threat of physical harm—which is what this provision of the Restatement clearly addresses. Accordingly, the negligence claim is dismissed without prejudice as to all Defendants.

---

one-third of the construction had been completed. Mr. and Mrs. Speights sued their own bank because it had disbursed loan proceeds to the contractor in contravention of the agreed upon milestones. The bank's premature loan disbursements ultimately resulted in unpaid suppliers filing materialman's liens against the property. The Arkansas Supreme Court found the bank directly and vicariously liable for improperly disbursing loan proceeds and, consequently, that any losses suffered by the Speightses (including those due to properly perfected materialmen's liens) "must fall on [the bank]." 239 Ark. at 590. Thus, *Speights* stands for the proposition that a bank owes a duty of care to its own customer in circumstances like those at issue in the case at bar. But *Speights* did not recognize a bank's duty of care to non-customers. While it is true that the *Speights* Court also adjudicated the materialmen's liens—and the materialmen were not the bank's customers—a suit to enforce a lien does not sound in tort and is not dependent on the existence of a duty of care. *Id*.

### C. Breach of Fiduciary Duty

Somewhat related to HAI's negligence claim is its claim that Defendants breached certain fiduciary duties they owed to HAI. Once again, Arkansas law is not on HAI's side. In *Country Corner Food and Drug, Inc. v. First State Bank and Trust Co. of Conway, Arkansas*, the Arkansas Supreme Court considered whether a grocery store had adequately stated a claim for breach of fiduciary duty against a bank that provided the store a large loan. The principals of the store were represented to be "unsophisticated borrower[s]"—like Mr. Adams—who claimed the bank's representatives owed them a duty to protect their financial interests by renewing their loan and not foreclosing on their property. 332 Ark. 645, 654 (1998). The borrowers alleged that "Bank representatives made false representations by stating that the 1988 promissory note in the amount of $194,734 would be renewed" and that "the renewal note was being prepared." *Id.* at 653. These facts are analogous to HAI's, as Mr. Adams maintains U.S. Bank and GAT led him to believe he would receive the full amount of every draw he demanded.

The *Country Corner* court found that the facts in the complaint failed to show a relationship between the bank and its customer that was "more than a debtor/creditor relationship," which is necessary to establish a fiduciary duty. *Id.* at 654. In the instant case, HAI and Defendants did not even have a debtor/creditor relationship—let alone the something "more" that the law requires for a fiduciary duty. As the *Country Corner* court aptly noted, a party's "[l]ack of sophistication" that results in it being "misled" is insufficient, as a matter of law, to "create a fiduciary relationship." *Id.* The Court finds HAI has failed to state facts to show a fiduciary duty owed by any of the Defendants, so this claim is also dismissed without prejudice.

### D. Tortious Interference

The final claim is for tortious interference with contract, which HAI asserts only against U.S. Bank and Ms. Beck. To prove tortious interference, Arkansas law requires a plaintiff to show: "(1) the existence of a valid contractual relationship or a business expectancy; (2) knowledge of the relationship or expectancy on the part of the interfering party; (3) intentional interference inducing or causing a breach or termination of the relationship or expectancy; and (4) resultant damage to the party whose relationship or expectancy has been disrupted." *Baptist Health v. Murphy*, 2010 Ark. 358, 15 (2010). The element of "intentional interference" necessarily requires the actor's conduct to have been improper and without authority. To evaluate the impropriety of the alleged interference, the Court must "look to the factors in section 767 of the *Restatement (Second) of Torts* for guidance." *Id.* Those factors include the nature of the actor's conduct, the actor's motive, the interests of the other with which the actor's conduct interferes, the interests sought to be advanced by the actor, the social interests in protecting the freedom of action of the actor and the contractual interests of the other, the proximity or remoteness of the actor's conduct to the interference, and the relations between the parties. *Id.* at 15–16 (citing Restatement (Second) of Torts § 767).

The Complaint asserts that the following facts show U.S. Bank's and Ms. Beck's intentional, improper interference with the contractual relationship between HAI and Ms. Dodgen:

- Ms. Beck was "bias[ed] against Adams and in favor of Dodgen in violation of U.S. Bank policies and to the clear detriment of Adams." (Doc. 3, ¶ 39). Ms. Beck therefore intentionally and improperly created a builder's

spreadsheet on behalf of HAI and "entered line-item categories in the builder's spreadsheet that literally did not exist at the project." *Id.* at ¶ 35. Ms. Beck was then "directed by U.S. Bank's Home Mortgage Construction Administration department that she needed to correct the line items on the spreadsheet, but she never corrected the spreadsheet causing ongoing issues throughout the project." *Id.* at ¶ 38.

- Even though "Dodgen and Adams specifically agreed that the cost for dirt work was Dodgen's sole responsibility and the cost of which would be explicitly excluded from the contract's guaranteed price," *id.* at ¶ 45, Ms. Beck "coordinated with GAT representatives to give Dodgen this credit [for the cost of dirt work] though they were all aware Adams was to receive [this money] as a down payment" for his work at the home construction site, *id.* at ¶ 59.

- "U.S. Bank management reviewed Susan Beck's work and created internal documentation explicitly stating Dodgen had to pay Adams" the money she erroneously received for the cost of the dirt work. *Id.* at ¶¶ 63–64.

- Ms. Dodgen "had a discussion with Susan Beck in which Dodgen informed Beck of her Anstaff Bank loan [for the cost of dirt work] and her Home Depot credit card charges [for appliances] and [Beck] instructed Dodgen to submitted [sic] these items to GAT" for payment—even though Ms. Beck knew that Ms. Dodgen and HAI had made a prior agreement that the Anstaff loan and the Home Depot bill were Ms. Dodgen's personal debts and were not to be reimbursed from the construction loan. *Id.* at ¶ 103.

- Ms. Beck "assisted Dodgen" to have her personal debts paid out of construction loan proceeds—and did so in order to help Ms. Dodgen and hurt HAI. *Id.*

The Court is skeptical that HAI can prevail on the merits because of U.S. Bank's and Ms. Dodgen's contractual authority and discretion to determine the appropriateness of any given draw request. But the motion here is based on the pleadings, not the merits. At this stage of the proceedings, the Court's task is to determine whether the above facts plausibly state a claim for improper interference with a business or contractual relationship. HAI maintains that Ms. Beck sought—for whatever reason—to ruin the contractual relationship between HAI and Ms. Dodgen and to benefit Ms. Dodgen to HAI's detriment. Ms. Beck allegedly encouraged and instructed Ms. Dodgen to breach her contract with HAI and also created erroneous documentation for the purpose of benefiting Ms. Dodgen to HAI's detriment. The Complaint also claims that Ms. Beck's conduct was against bank policy and out of line with ordinary loan servicing procedures, yet U.S. Bank failed to take action to stop Ms. Beck until it was too late. Theoretically, Ms. Beck's non-compliance with internal policies could infer both intent and improper purpose. The Restatement instructs that "when there is room for different views, the determination of whether the interference was improper or not is ordinarily left to the jury, to obtain its common feel for the state of community mores and for the manner in which they would operate upon the facts in question." Restatement (Second) of Torts § 767, cmt. l. Accordingly, the Court declines to dismiss the tortious interference claim under Rule 12(b)(6). U.S. Bank may certainly revisit this claim at the summary judgment stage when the proof may or may not suggest a different outcome.

However, the Court agrees with U.S. Bank that this claim should be stayed until the pending state court lawsuit between Ms. Dodgen and HAI is fully resolved on the merits. A court may stay an action to maximize the effective use of judicial resources and to minimize the possibility of conflicts between different courts. *Mitsubishi Heavy Indus., Ltd. v. Gen. Elec. Co.,* 720 F.Supp.2d 1061, 1068 (W.D.Ark.2010) (citing 5C Charles A. Wright and Arthur R. Miller, *Federal Practice and Procedure* § 1360 (3rd ed.2004)). A motion to stay may be warranted when a similar action is pending in another court. *Id.*

In the state court case, HAI has filed a counterclaim for breach of contract against Ms. Dodgen for the precise amount demanded in the case at bar: $63,526.38. Any actual damages HAI seeks to recover in the instant lawsuit would necessarily be reduced by any damages HAI recovered against Ms. Dodgen in state court for breach of contract. Otherwise, HAI could end up with a double recovery. On the other hand, if HAI lost in state court and were not entitled to recover any additional amounts from Ms. Dodgen under the terms of the residential construction contract, such a finding could impact the tortious interference claim in this Court. To avoid these problems and to conserve the parties' and the Court's resources, the tortious interference claim will be stayed.

## IV. CONCLUSION

**IT IS THEREFORE ORDERED** that Defendant U.S. Bank National Association's Motion to Dismiss (Doc. 7) is **GRANTED IN PART AND DENIED IN PART**. All claims in the Complaint against U.S. Bank and its agent, Susan Beck, are **DISMISSED WITHOUT**

**PREJUDICE** under Rule 12(b)(6) for failure to state a claim except for the claim for tortious interference with contract.

**IT IS FURTHER ORDERED** that Defendant Great American Title Company, LLC's Motion to Dismiss (Doc. 12) is **GRANTED**, and all claims against it are **DISMISSED WITHOUT PREJUDICE** for failure to state a claim. Accordingly, the Clerk is directed to **TERMINATE** Great American Title as a party to this action.

With respect to the sole claim remaining against U.S. Bank and Ms. Beck for tortious interference, the Court **ORDERS** that the claim be **STAYED** pending final resolution of Henry Adams, Inc.'s counterclaim against Brandi Dodgen for breach of contract, which is pending in the Circuit Court of Carroll County, Arkansas.

Accordingly, the Clerk of Court is **DIRECTED** to administratively terminate and stay the case—which now only contains the claim for tortious interference against U.S. Bank and Ms. Beck. Plaintiff is **ORDERED** to file a motion to reopen this case, if appropriate, once its state court counterclaim has been decided on the merits. Until then, Plaintiff is **ORDERED** to file quarterly status reports describing the status of the state court proceedings. The first such quarterly report shall be due on March 31, 2023, with subsequent status reports being due at the end of each calendar quarter thereafter.

**IT IS SO ORDERED** on this 21st day of November, 2022.

_____
TIMOTHY L. BROOKS
UNITED STATES DISTRICT JUDGE